Gants, J.
The plaintiff, Manuel Mello (“Mello”), is a prisoner at the Souza-Baranowski Correctional Center, and has been since at least October 2002. He has filed this certiorari action challenging the guilty findings and sanctions imposed against him regarding a disciplinary report issued on September 24, 2002. The relevant parties — Mello and the Department of Correction (“DOC”) — have cross-moved for judgment on the pleadings. After hearing, for the reasons detailed below, the defendant’s motion for judgment on the pleadings is DENIED and the plaintiffs motion for judgment on the pleading is ALLOWED.
BACKGROUND
According to the Administrative Record, at roughly noon on September 24, 2002, Mello was directed to produce a urine sample within a two-hour period, and *370 failed to do so.[1] Solely as a result of this failure, a Disciplinary Report (“D-Report”), No. 02-1242, was issued against him, and he was placed on awaiting action status. D-Report 02-1242 made four allegations against Mello, all based on his failure timely to provide a urine sample:
Disciplinary Offense No. 2 — "violating any departmental rule or regulation . .
Disciplinary Offense No. 3 — "failure to keep one’s person or one’s quarters in accordance with institutional rules”;
Disciplinary Offense No. 8 — "conduct which disrupts or interferes with the security or orderly running of the institution"; and
Disciplinary Offense No. 12 — "refusal to take a breathalyzer test or provide a urine sample."
The disciplinary hearing was initially scheduled for October 2, 2002, but was rescheduled at the request of the Disciplinary Hearing Officer to October 11 and then to October 17, 2002. Mello’s defense to this allegation was that he was taking a medication— Elavil — that was known to cause urination problems. To support this defense, Mello made a written request for the testimony of two witnesses:
“Mary Ann,” the nurse who provided him with this medication and who would purportedly testify that he had complained for months of urination problems; and
Dr. Smith, who would purportedly testify that Mello had often complained about the urinary side effect of this medication.
Mello also requested his medical records, which he contended would show that he suffered from this side effect of Elavil. The Disciplinary Hearing Officer, R. Kelly, denied Mello’s request for medical records, writing, “Confidential inmate must obtain.” [sic]. He also denied Mello’s request for the testimony of Nurse Mary Ann and Dr. Smith, writing that both were not DOC employees but rather were contract employees “not bound by the disciplinary process.”[2]
According to the Disciplinary Hearing Report prepared by Hearing Officer Kelly, only one witness furnished evidence at the hearing — Mello. There is nothing to indicate that any DOC employee testified, not even the correctional officer who submitted the Disciplinary Report. Mello testified that he was on Elavil, and provided a document from an internet site — www.healthsquare.com—that declared that the side effects of Elavil “may include . . . difficult or frequent urination . . . [and] fluid retention.” Mello said that he has had a problem urinating since he was at MCI Concord, and told the Superintendent of the problem. According to Mello, the Superintendent directed Officer Hooper to look into it before Mello was told to provide a urine sample. Mello also provided the Hearing Officer with DOC’s policy regarding Inmate Substance Abuse Testing, Sanctioning and Treatment Interventions, 103 DOC 525, including Section 525.03, which provides for “Alternative Testing/Collection Procedures” when “an inmate claims that he/or she is unable to provide a urinalysis sample due to a documented or undocumented medical or mental health condition . . .”
Hearing Officer Kelly found Mello guilty of Disciplinary Offenses 2, 8, and 12. He made no ruling regarding Disciplinary Offense No. 3. Hearing Officer Kelly wrote in support of his decision, “The findings are based on the written report and the fact that inmate Mello admits that he did not provide a urine. He states that it was because of his medication.” The sanctions that Hearing Officer Kelly imposed upon Mello were severe: 30 days in isolation, 26 weeks loss of canteen and visits, and $144 restitution for one year of drug testing.
Mello appealed this D-Report finding to Superintendent Edward Ficco. In his appeal, Mello specifically identified the alternative urine collection procedures in 103 DOC 525.03, and argued that these procedures had not been followed in his case. On October 24, 2002, the Superintendent denied the appeal, writing, “[A]lthough inmate on medication, medical staff indicate inmate should be able to provide within time frame.” There is nothing in the Superintendent’s findings or in the Administrative Record that indicates who from the medical staff he spoke with regarding Mello’s ability to urinate within two hours.
While Mello was awaiting his hearing on D-Report 1242, he was directed again on October 9, 2002 to produce a urine sample within a two-hour period, and again failed to do so. Solely as a result of this failure, a second D-Report, No. 02-1317, was issued against him. The hearing on this D-Report appears to have been consolidated with the October 17, 2002 hearing on 02-1242, and Hearing Officer Kelly’s findings were the same — guilty of refusing to provide a urine sample. The sanctions he imposed for this second violation were even more severe: 30 days in isolation, 52 weeks loss of canteen and visits, and $144 restitution for drug testing.[3] Although not reflected in the Administrative Record, Mello and the DOC agree that this D-Report 02-1317 was recently dismissed, albeit after Mello had already served his 30 days in isolation and his year-long loss of canteen and visits. Consequently, the findings and sanctions in D-Report 02-1317 are no longer before this Court on certiorari review. The findings and sanctions in D-Report 02-1242, however, have not been dismissed and remain subject to certiorari review.[4]
STANDARD OF REVIEW
A prisoner has the right to challenge the guilty findings of his disciplinary hearing through an action in the nature of certiorari under G.L.c. 249, §4. Hill v. Superintendent, Mass. Correctional Inst., Walpole, 392 Mass. 198, 199 n.2 (1984); Jordan v. Superintendent, Massachusetts Correctional Inst, Cedar Junction, 53 *371 Mass.App.Ct. 584, 587 (2002). When an inmate challenges the sufficiency of the evidence to justify a hearing officer’s disciplinary decision, the court must determine whether the hearing officer’s findings are supported by substantial evidence. Murphy v. Superintendent Mass. Correctional Inst, Cedar Junction, 396 Mass. 830, 833 (1986); Jordan, 53 Mass.App.Ct. at 587. “Substantial evidence is evidence that ‘a reasonable mind might accept as adequate to support a conclusion, . . . taking into account whatever in the record fairly detracts from the weight of the evidence.’ ” Jordan, 53 Mass.App.Ct. at 587, quoting Cepulonis v. Commissioner of Correction, 15 Mass.App.Ct. 292, 296 (1983), which quotes from Trustees of Forbes Library v. Labor Relations Commn., 384 Mass. 559, 568-69 (1981). The court may not displace the hearing officer’s “exclusive function to weigh the credibility of the witnesses and to resolve factual disputes” in the testimony. Jordan, 53 Mass.App.Ct. at 588; Cepulonis, 15 Mass.App.Ct. at 295. Nor, where the testimony could lead to different inferences, may a court displace the hearing officer’s choice, in the context of the prison environment, between two fairly conflicting inferences. Jordan, 53 Mass.App.Ct.. at 589; Cepulonis, 15 Mass.App.Ct. at 295. Yet, while “great deference” is owed to the hearing officer’s decision, the court need not defer to it “(w]here the evidence is so limited and problematic” that it cannot support such a decision. Jordan, 53 Mass.App.Ct. at 589-90.
DISCUSSION
Here, it is crystal clear that there was not substantial evidence to support the guilty findings in D-Report 1242. Indeed, it is crystal clear that DOC blatantly ignored its own policies regarding the collection of urine samples and the imposition of disciplinary sanctions for refusing to give such a sample.
Under the DOC’s policy regarding the collection of urine samples from inmates, which became effective on December 1, 2001, less than one year before Mello was asked for a urine sample, inmates who refuse to provide a urine specimen shall be subject to discipline for “refusal... to provide a urine specimen.” 103 DOC 525.06. The policy provides:
No waiting period or extra time need be allowed for an inmate who directly and specifically refuses to provide a urine sample. Inmates who do not provide a specimen within two (2) hours of being ordered to do so shall be considered to be refusing to provide a specimen, with the exception of those inmates presenting medical and/or mental/psychological problems as outlined in 525.03 . . . [T]he inmate shall be asked for the reason he/she is refusing to provide a sample .. . The reason shall... be documented in the disciplinary report issued to the inmate for refusing to provide a substance abuse sample.
Id. D-Report 1242 does not reflect that Mello directly or specifically refused to provide a urine sample. Nor does it indicate that he was asked why he could not provide a sample within the required two hours. Nor is any reason for his failure timely to provide a sample documented as required in the D-Report. On this ground alone, the D-Report should have been dismissed.
The uncontradicted evidence in the Administrative Record demonstrates that Mello contended that the reason he could not provide a sample was because urination problems were a side effect of his medication. Under 103 DOC 525.03:
In the event an inmate claims that he ... is unable to provide a urinalysis sample due to a documented or undocumented medical or mental health condition, . . . the following guidelines shall be followed;
The collection officer, if the condition is reported to be a documented medical condition, shall confirm the condition with the appropriate medical personnel and proceed to 525.031(D).
The collection officer, if the condition is reported to be an undocumented medical condition, shall schedule an appointment with the appropriate medical personnel and proceed to 525.031(D) below.
103 DOC 525.03. Section 525.031(D), which governs regardless of whether the medical condition is documented or undocumented, provides:
The inmate shall be secured in a diy cell[5] and the Superintendent or designee shall be immediately notified. The Superintendent or designee shall decide which alternative testing methodology will be used.
103 DOC 523.031(D). In short, when Mello claimed that he could not provide a urine sample within the required two hours because he suffered from urination problems as a side effect of his medication, regardless of whether this problem was documented in Mello’s medical records, DOC’s policy required that he be secured in a diy cell and left there until he urinated. 103 DOC 523.031(E)(3).
The record is clear that the correction officer ignored this policy and simply issued a D-Report when the two hours passed as if Mello had refused to provide a urine sample and said nothing about his medical condition. The Hearing Officer also ignored this policy in finding Mello guilty of the various disciplinary violations, all of which relied on a finding that Mello had refused to provide a urine sample, even though Mello had provided the Hearing Officer with a copy of the policy. The Superintendent also ignored this policy in denying the appeal, even though Mello had specifically argued in his appeal that this policy had been violated.
This Court finds that the guilty findings in D-Report 02-1242 were not supported by substantial evidence, and orders that those guilty findings be dismissed and removed from Mello’s prison record. This Court also orders that the $144 in restitution he was required to *372 pay because of those unsupported guilty findings, if paid, be returned to him, with interest. Sadly, this Court is not able to compensate Mello for the more severe sanctions he suffered as a result of this bogus disciplinary finding — the 30 days he was required to spend in isolation, and the 26 weeks of canteen and visits he lost.
The discipline imposed against Mello at MCI Souza-Baranowski was not merely unsupported by substantial evidence; it was an affront to justice that should cause those in authority at DOC to take a long, hard look at the manner in which prisoners are disciplined at that facility. It is unconscionable that a prisoner should spend 30 days in isolation and be deprived of visits and the use of the canteen for half the year because those in authority at MCI Souza-Baronowski ignored a DOC policy that specifically recognizes that those with medical problems may need more than two hours to urinate. If sanctions this severe can be handed down so cavalierly in this case, one must ask whether fairness and judgment are the rule or the exception in other disciplinary matters.[6]
ORDER
For the reasons detailed above, the defendant’s motion for judgment on the pleadings is DENIED and the plaintiffs motion for judgment on the pleading is ALLOWED. This Court finds that the guilty findings in D-Report 02-1242 were not supported by substantial evidence, and ORDERS that those guilty findings be dismissed and removed from Mello’s prison record. This Court also ORDERS that the $144 in restitution he was required to pay because of those unsupported guilty findings, if paid, be returned to him by the Department of Correction, with statutory interest forthwith. Judgment shall enter against the defendant Department of Correction in accordance with this Order. The complaint against the individual defendants shall be dismissed, without costs, since the relief sought in this certiorari action can only be obtained from the Department of Correction.

The record is silent as to whether this was a routine request for a urine sample or was based on specific information indicating drug abuse.

Although not plain from the record, all agree that medical services for prisoners in the custody of the DOC at this time were provided through a private contractor, Correctional Medical Services.

It is not clear from the Administrative Record whether these sanctions were to be served concurrently with those in D-Report 1242, or consecutive to them. Mello stated at the hearing that he had served 60 days in isolation.

No explanation was offered by DOC as to why it dismissed D-Report 02-1317 but failed to dismiss D-Report 02-1242, since both allege a failure to provide a urine sample within the two-hour time frame in the fall of 2002.

A "dry cell” is defined in the DOC policy as “a secured cell with no running water and no toilet/urinal.” 103 DOC 525.03(I)(E). Under the DOC policy, “Dry cell testing should be considered as a first option to our primary collection methodology as it utilizes the same testing equipment and can be performed immediately in house.” Id, The procedure for dry cell testing requires the collection officer to search the dry cell and ensure that it is cleaned of possible contaminants. The inmate then must strip down to his underwear and is left alone in the dry cell with only his specimen cup, with instructions to notify DOC staff once he has succeeded in urinating. Id,

This Court fully recognizes that drug abuse is a serious problem in our prisons, that urine testing is necessary to determine whether inmates are abusing drugs, and that inmates may not be permitted to avoid giving a urine sample simply by claiming that they are unable to urinate. This Court also recognizes, as does DOC’s own policy, that some inmates have medical and psychological problems that may prevent them from always being able to urinate in two hours upon demand. Under the DOC’s policy, these inmates are not freed from their obligation to give a urine sample; rather, they are essentially stripped down to their underwear, placed in a dry cell, and ordered to remain there until they urinate. This DOC policy fairly balances the prison’s need for urine testing with the medical limitations of some prisoners. Ignoring that policy, as happened here, unfairly disrupts that balance and constitutes an abuse of authority.